# In the United States Court of Federal Claims

No. 18-326C
(Filed: August 3, 2018)
(Re-filed: August 21, 2018)[1]

* * * * * * * * * * * * * * * * * * * * * * * *

ADVANCED MANAGEMENT STRATEGIES
GROUP, INC./REEFPOINT GROUP, LLC,

        *Plaintiff,*

v.

THE UNITED STATES,

        *Defendant,*

and

ENTERPRISE RESOURCE PERFORMANCE, INC.,

        *Intervenor.*

Post-award bid protest;
Standing; Zone of active
consideration; SDVOSB;
Affiliation.

* * * * * * * * * * * * * * * * * * * * * * * *

*Craig A. Holman*, Washington, DC, with whom were *Nathaniel E. Castellano* and *Alexandra L. Barbee-Garret*, for plaintiff. *Carrol H. Kinsey, Jr.*, Alexandria, VA, of counsel.

*Sonia M. Orfield*, Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Chad A. Readler*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Reginald T. Blades, Jr.*, Assistant Director, for

---

[1] This opinion was originally issued under seal to afford the parties an opportunity to propose redaction of protected information. The parties were unable to agree. Plaintiff offered no redactions. In an abundance of caution, we have adopted intervenor's proposed redaction of the names of its sub-contractors and teaming partners because that information is potentially competition sensitive to an ongoing procurement. We have also adopted defendant's proposed redactions.

defendant. *Karen Hunter*, Trial Attorney, U.S. Small Business Administration, Office of General Counsel, of counsel.

*Julia Di Vito*, Washington, DC, with whom were *Antonio R. Franco*, *Peter B. Ford*, and *Timothy F. Valley*, for intervenor.

OPINION

BRUGGINK, *Judge*.

This is a post-award bid protest brought by Advanced Management Strategies Group, Inc./Reefpoint Group, LLP ("AMSG"). Defendant is the United States acting through the Department of Veterans Affairs ("VA"). The awardee, Electronic Resource Performance, Inc. ("ERPi"), intervened. AMSG's complaint asks the court to enjoin the VA from awarding to ERPi. The parties filed cross-motions for judgments on the Administrative Record ("AR"). Oral argument was held on July 12, 2018. The court held a status conference on July 20, 2018, during which we announced that we would sustain the protest and enjoin the award to ERPi. We entered an injunction that same day. Because the VA was arbitrary in crediting ERPi with the Commercial Healthcare Experience of what could be, at best, only a very minor subcontractor, the award must be set aside and the evaluation redone.[2]

BACKGROUND

On September 28, 2017, the VA Strategic Acquisition Center issued Request for Quotations No. VA119A-17-Q-0413 ("RFQ" or "solicitation"). It sought commercial healthcare consulting services to help transform the VA health system into a more modern and veteran-centric healthcare system pursuant to the Veterans Access, Choice, and Accountability Act of 2014, Pub. L. No. 113-146, 128 Stat. 1754 (2014). The VA set aside the contract for Service Disabled Veteran Owned Small Businesses ("SDVOSB") under

---

[2] This opinion deals only with the issues necessary to reach our conclusion: ERPi's eligibility for award as a small business, VA's evaluation of ERPi's Corporate Healthcare Experience, and plaintiff's standing to bring these challenges. The other arguments raised by plaintiff's motion were dealt with on the record during the status conference held on July 20, 2018. It is unnecessary to consider those arguments again in print.

NAICS Code 541611, which has a size standard of $15,000,000.[3]  AR 178. The VA sought these services from holders of the General Services Administration ("GSA") Federal Supply Schedule ("FSS") SIN 874-1 contracts for integrated consulting services.  AR 239.  The solicitation promised award of a Blanket Purchase Agreement ("BPA") to a single offeror pursuant to Federal Acquisition Regulation ("FAR") part 8.405-3, and that the agency would issue its first order along with the BPA.  AR 247.  The agency intended to do so without holding discussions with offerors, but reserved for itself the right to ask for a price discount from the apparent awardee as allowed in FAR part 8.405-4.  *Id.*  The solicitation was specific that the procurement was not subject to FAR part 15,which deals with negotiated procurement.

I.  The Solicitation

The VA intended to award the BPA on the basis of a best value trade-off process, which would consider three non-price factors and the offerors' prices.  The non-price factors are 1) Technical, consisting of three subfactors (Technical Approach, Staffing/Management Plan, and Key Personnel Resumes); 2) Commercial Healthcare Experience; and 3) Past Performance. *Id.*  The technical and commercial healthcare factors were considered of equal importance, and together these two factors "[were] significantly more important than the Past Performance Factor.  All non-Price Factors, when combined, [were] significantly more important than Price."  AR 248.

Under the Technical Factor evaluation, for the Technical Approach subfactor, the agency sought to ascertain from offerors' proposals their understanding of the problem embraced by the work, the feasibility of offeror's proposed solutions, including "the level or effort and mix of labor proposed to perform the tasks identified in the first BPA order," and whether the offers "have adequately and completely considered, defined, and satisfied

---

[3] "NAICS" is an acronym for the North American Industry Classification System.  Industries and commercial activities are assigned codes by the by the Office of Management and Budget.  Contracting Officers select the appropriate code for a procurement that is set aside for small businesses.  The Small Business Administration assigns dollar values to each code, which then becomes the size limits for the purpose of whether companies are considered to be small for any particular federal procurement.  *See generally InGenesis, Inc. v. United States*, 104 Fed. Cl. 43, 45 (2012).

the requirements specified in the solicitation." AR 249. For the Key Personnel and Staffing Plan subfactors, the agency considered whether offerors would have adequate key personnel and other staff available to perform the work within the requested period of time.

With the second factor, Commercial Healthcare Experience, the VA aimed at plumbing the depths of offerors' and any subcontractor's specific experience with commercial healthcare projects based on "previous demonstrated recent and/or relevant experience. The breadth and depth of the experience, criticality of any experience gaps identified, relevance to the solicitation, and the quoter's approach" were all considered by the agency under this factor. *Id.* The solicitation stated that a lack of such experience would be a negative while demonstrated "experience in both commercial healthcare and government healthcare with transformed organizations similar in size and complexity to VA will be rated more favorably." AR 249-50. In the questions and answers, added by amendment to the RFQ, the VA clarified that offerors could submit their own experience and the experience of any proposed subcontractor, no matter the size. *See* AR 155. The solicitation later stated that, for this factor, an offeror was considered to be the prime contractor and "all proposed subcontractors, major or otherwise." AR 249. A major subcontractor was separately defined in the RFQ under the Past Performance factor.

The Past Performance Factor was concerned more broadly with the risk associated with offerors' proposals as measured by the "historical quality of a firm's performance" because the agency viewed offerors' past performance history as having "predictive value when it comes to assessing the risk of doing business with the firm." AR 250. Offerors were evaluated on the basis of their own past performance and that of any major subcontractors, defined as "one whose subcontract is for more than 20% of the total proposed price." *Id.* Prime contractors and major subcontractors were assessed individually "and the results [were] then assessed in their totality to derive the quoter's Past Performance rating." *Id.* The VA considered the "quality, relevancy (size and scope, and complexity) and recency (within last 3 years)" of these companies' past performance. *Id.* Offerors without such experience were given a neutral rating.

Offerors' prices were evaluated for the fairness and reasonableness of their labor rates and the total price for the first order against the BPA, including "the level of effort and mix of labor proposed to perform the specific

tasks being ordered." AR 251.  Offerors were warned that unreasonable prices would be rejected, resulting in disqualification for award.  AR 247.

## II.  Evaluation And Award

The agency received six proposals in response to the RFQ by the November 6, 2017 deadline.  All six were determined to be eligible as SDVOSBs.  Three proposals are relevant to this protest:  plaintiff's, intervenor's, and that from a third-party, [                    ].  The agency began evaluations on November 13, 2017.  The technical evaluators performed individual and consensus evaluations of each proposal received.  A separate team evaluated offerors' prices.  For the non-price factors, the technical team assessed strengths and weakness, confidence ratings, any deficiencies found, and assigned adjectival ratings.  The consensus results were as follows for the three relevant offerors:

| Factor | ERPi | [    ] | AMSG |
|--------|------|--------|------|
| Technical Approach | Excellent | Good | Satisfactory |
| Commercial Healthcare Experience | Substantial Confidence | Substantial Confidence | Satisfactory Confidence |
| Past Performance | Moderate risk | Moderate Risk | Moderate Risk |
| Total Price | $3,925,388.48 | $5,046,135.36 | $5,215,473.59 |
| Price Reasonableness | Fair and Reasonable | Fair and Reasonable | Fair and Reasonable |

*See* AR 1474.

The contracting officer ("CO") did not change these ratings, and he relied on them in making his best value determination.  On January 22, 2018, the CO requested a price reduction from ERPi prior to award, representing to intervenor that it was among the highest rated quotes, but not revealing that it was going to be the awardee.  ERPi responded the next day with minor discounts.

The CO finalized the best value determination on January 30, 2018, the same day that the technical evaluation team finalized its report.  The best value determination document included a best value trade-off analysis between ERPi and [      ], AR 1477-79, and a separate trade-off between ERPi and plaintiff, AR 1475-77.   The CO found ERPi to represent the best value to the government because it represented both the highest rated and the lowest priced offer.  AR 1479.  The document also touts the experience of ERPi and its team as providing exemplary Commercial Healthcare Experience.  *See* AR 1475, 1477-78.  The CO added an addendum to reflect ERPi's discounted final prices.  The best value determination was signed on January 31, 2018.  The final consensus technical evaluation was signed by some of the evaluators on February 1 and by others on February 2, 2018, but a notation appears next to those signatures indicating that the report was finalized on January 30, 2018.  AR 1234, 1254, 1276, 1297, 1316, 1336.  The best value determination indicated that performance would commence on February 1, 2018.

The VA notified offerors of the results on February 1, 2018.  Debriefings were requested by the unsuccessful offerors, and those were conducted on February 6, 2018.

III.  Procedural History

Plaintiff submitted a small business size protest against ERPi on February 6, 2018.  The CO referred the challenge to the Small Business Administration ("SBA") the next day, and issued a stop work order on February 8, 2018, pending resolution of the size protest.

On February 12, 2018, the regional SBA office dismissed plaintiff's size challenge as untimely because it was not brought within five days of the award to ERPi.  AR 1999-2001.  SBA relied on the regulatory requirement that, for contracts placed against a long-term multiple-award contract, size challenges must be brought at the time of award of the original contract that placed the offeror on the multiple-award schedule, here the original GSA FSS.  No new opportunity for protest arose when the agency solicited a BPA against the schedule contract.  Plaintiff then appealed to the SBA's Office of Hearings and Appeals ("OHA") which likewise dismissed the challenge as untimely.  AR 2244-45 (SBA OHA decision of May 7, 2018).

On March 2, 2018, plaintiff filed suit in this court prior to the resolution of its appeal at SBA OHA.  ERPi intervened on March 9, 2108**.**  After OHA

denied plaintiff's appeal on May 7, 2018, plaintiff was granted leave to amend its complaint to add allegations concerning the SBA OHA size decision. The parties completed two rounds of briefing for judgment on the administrative record, the second round concerned solely with the issue of ERPi's eligibility as a small business. We held oral argument on July 12, 2018, and on July 20, 2018, we sustained the protest and entered an injunction after informing the parties of the result during a telephonic status conference. Order, ECF No. 39 (July 20, 2018).

<u>DISCUSSION</u>

This court has jurisdiction over challenges brought by interested parties to actions taken by federal agencies in connection with the procurement of goods and services. 28 U.S.C. § 1491(b)(1) (2012). We review such agency action pursuant to the standards set forth in the Administrative Procedures Act ("APA"), 5 U.S.C. § 706 (2012). 28 U.S.C. § 1491(b)(4) (setting the standard of review for bid protests to those proscribed in the APA. Thus, to prevail the protester must establish that the agency acted arbitrarily or capriciously or acted in a manner that was not in accordance with law. 5 U.S.C. § 706. This means that the protestor must demonstrate that the agency lacked a rational basis or violated applicable law or regulation. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001). If the agency "examines the relevant data and articulates a satisfactory explanation," the decision will not be second-guessed by the court. *Gulf Grp. Inc. v. United States*, 61 Fed. Cl. 338, 351 (2004). But, "where the agency fails to undertake a review or fails to documents such review, we must conclude that it acted irrationally." *Starry Assocs., Inc. v. United States*, 127 Fed. Cl. 539, 549 (2016) (citing *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 370 (2009)). If the agency action is found to be illegal or otherwise irrational, the protestor must also show that it was harmed; i.e., that had it not been for the agency's error, "it would have had a substantial chance of securing the contract." *Labatt Food Servs., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009).

I. Plaintiff Has Standing

We begin with the latter question: whether plaintiff has standing to challenge the award. Defendant and intervenor aver that plaintiff has not been harmed because it is not next in line to receive the award should the award to

ERPi be set aside.  They point to [    ] as the next ranked offeror and most likely to receive the award if the contract is not awarded to ERPi.

Plaintiff responds by arguing that it need only show that it was "within the active zone of consideration," *Alfa Laval Separation Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999), and that the record shows just that with respect to the agency's consideration of its proposal.  We agree.  The record shows that the agency performed a best value trade-off between ERPi's proposal and AMSG's as well as a best value trade-off between ERPi and [    ].  AR 1475-79.  Under these circumstances, we think plaintiff has established standing.  Although most of the cases cited by the parties deal with situations in which the party found to have standing was second in line, a protestor need not show that it would have received the award but for the alleged error.  *Id.* (citing *Data General Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996)).  When the agency's best value trade-off includes the protestor, even when it was not notionally the second-rated offeror, the protestor has established that it would have had a substantial chance of receiving the award but for the alleged error.[4]  The law is plain that, in the context of a best value procurement, agencies have broad discretion to award for any reason that meets a bare standard of rationality.  We thus cannot conclude that there is no possible reason the agency might award to AMSG over [    ].  In other words, here, the law will not assume it a *fait accompli* that the next highest rated proposal would receive the award. Plaintiff has established that there is a substantial chance that it might be awarded the contract if ERPi is not selected and it thus has standing to maintain the protest.

## II.  ERPi Was Eligible For Award

Plaintiff argues that ERPi was ineligible for award because it was not small, per the applicable NAICS code, at the time of award of the BPA. Plaintiff points to the VA's own published guidance, which goes beyond the SBA regulations to require that an offeror represent that it is small at the time of award.  AMSG argues that this additional requirement is not met simply by having the applicable certifications of eligibility on file, but rather that the offerors must make new affirmative representations of their size status at the

---

[4] Nowhere in the best value determination is it affirmatively stated that [    ] was the next-in-line offeror.  The ratings table provided above shows that it had the second highest non-price ratings, from which we infer it to be the second-rated.

time of award.  Plaintiff concludes that the SBA OHA decision dismissing the size protest of ERPi was flawed when it failed to apply the VA's own, more stringent requirements.  Even if the SBA was correct in following its own regulations, plaintiff urges that its decision is irrelevant because the VA was under an obligation to go further in assuring itself that the intervenor was in fact eligible for award at the time of award.  Plaintiff alleges that it was not, and thus should not have received the award.

Defendant answers that the SBA did no more than lawfully follow its own applicable regulations and that, even had it applied the VA's guidance, the result would not have changed.  The government argues that the applicable regulations, including the published guidance cited by plaintiff, do not require a new size certification at the time of award, but rather that the agency was permitted to rely at the time of award on ERPi's on-record certifications that it fit under the NAICS code.[5]  Defendant also argues that, to the extent plaintiff is challenging the service disabled veteran status of ERPi, that challenge is not ripe because plaintiff failed to pursue the issue administratively with the VA.[6]

A.  Small Business Set-Aside Regulations

We begin with the applicable regulations.  Two sets of regulations are implicated by this protest—the SBA's and the VA's—but the VA's regulations for small business set-asides tie the two together.  FAR part 819 deals with small business participation programs generally, and subpart 819.70 specifically applies to VA's set-asides for veteran-owned small businesses.  Subpart 7003 draws the link, stating that VA set-asides "continue[] to be governed by the Small Business Administration regulations, 13 CFR subparts 125.8 through 125.13, as well as the FAR, except where expressly directed otherwise by the VAAR, and 38 CFR verification regulations for SDVOSBs

---

[5] Intervenor also argues that the VA's class deviation was not legally binding on the agency because it was not the subject of notice and comment rule-making.  We do not reach that question because we find that the result is the same with or without the class deviation.

[6] We do not, however, view plaintiff's challenge as being directed at ERPi's veteran owned or service disabled status.  Thus we do not treat the issue below.  Plaintiff's attack is limited to the NAICS code size standard, which we believe to be properly before us due to plaintiff having protested the issue to the SBA and then appealed to SBA OHA.

and VOSBs." 48 C.F.R. § 819.7003(a) (2017).  Subpart 7003 continues: "(b) At the time of submission of offer, the offeror must represent to the contracting officer that it is a - (1) SDVOSB concern or VOSB concern; (2) Small business concern under the [NAICS] code assigned to the acquisition; and (3) Verified for eligibility in the VIP database."  *Id.* § 819.7003(b).

Subpart 819.7003(b)(2)'s requirement that offerors represent their size standard under the applicable NAICS code at the time of offer mirrors the applicable SBA-specific regulation, 13 C.F.R. § 125.14 (2017), which states that "At the time of contract offer, an SDVO SBC must be small within the size standard corresponding to the NAICS code assigned to the contract." Section 121.404 answers the question of when the size status of a business concern is determined: "SBA determines the size status of a concern . . . as of the date the concern submits a written self-certification that it is small to the procuring agency as part of its initial offer."  *Id.* § 121.404 (2017).

The next question is when is an offeror required to submit such certification.  Section 121.404 goes on to deal specifically with orders issued against a multiple award contract, such as the GSA FSS, and states that "SBA determines size at the time of initial offer, . . . for a Multiple Award Contract. . . . If a business is small at the time of offer for the Multiple Award Contract, it is small for each order issued against the contract, unless a contracting officer requests a new size certification in connection with a specific order." *Id.* § 121.404(1)(i).  If the CO "requests a new size certification for the order," then, and only then, "SBA will determine size at the time of initial offer . . . for an order."  *Id.*  § 121.404(1)(iii).  In sum, when the award is for an order against a multiple award schedule contract, as here, SBA will look to the certifications made by offerors when they entered into the schedule contract, not the order.  The only exception is when the CO of an agency submitting an order against the schedule requests new certifications.

SBA's size protest timeliness rules predictably follow the same logic. Because this contract is an order awarded under a long-term GSA FSS contract, SBA's long-term contract (or multiple award contract) timeliness regulation applies:

> For contracts with durations greater than five years (including options), including all existing long-term contracts, Multi-agency contracts, Governmentwide Acquisition Contracts and Multiple Award Contracts:

(i) Protests regarding size certifications made for contracts must be received by the contracting officer prior to the close of business on the 5th day, exclusive of Saturdays, Sundays, and legal holidays, after receipt of notice (including notice received in writing, orally, or via electronic posting) of the identity of the prospective awardee or award.

. . . .

(iii) Protests relating to size certifications made in response to a contracting officer's request for size certifications in connection with an individual order must be received by the contracting officer prior to the close of business on the 5th day, exclusive of Saturdays, Sundays, and legal holidays, after receipt of notice . . . .

*Id.*  § 121.1004(a)(3)(iii).  Subsections (i) and (iii) read together mean that protestors generally have five days from award of the master FSS contract to protest an awardee's size certification unless the CO requires re-certification at the time of award of an order against the FSS contract.  Here, the CO did not ask for a new certification at any point.

The VA's own supplemental procurement regulations, known as the VA Acquisition Regulation ("VAAR"), add another level of administrative requirements to VA procurements.  From time to time, the VA issues new rules that deviate from published FAR or VAAR provisions, called "deviations."  Plaintiff cites to the class deviation issued by the VA on July 26, 2016, which purports to supercede FAR  part 819.7003.  The deviation replaces subsection (b) with the following language: "At the time of submission of offers/quotes, *and prior to award of any contracts*, the offeror must represent to the contracting officer that it is . . ." and then it goes on to list the same three requirements of eligibility: status as a SDVOSB/VOSB, small under the NAICS code, and listed as verified in the VIP database.  Class Deviation—Veterans First Contracting Program (VFCP 2016), Attachment 4 § 819.7003 (July 25, 2016) (emphasis added).  This adds to FAR part 819.7003 the requirement that an offeror represent its eligibility to the CO at the time of award in addition to at the time of offer.  The impact of that additional requirement is the issue raised by plaintiff.

11

B.  ERPi Was Eligible at the Time of Award of its GSA FSS Contract
And at the Time of Award of the BPA

We hold that neither the VA nor the SBA erred.  SBA simply applied its timeliness requirements as written.  Nothing in the VAAR or published deviation purports to change the SBA's size protest timeliness rules.  That fact dictates the result reached by SBA OHA.  13 C.F.R. § 121.1004(a)(3)(i) and (iii) are clear that an offeror has five days from the award that places a contractor on the schedule contract to protest that awardee's size status or, if the CO asks for new certifications when placing an order against the supply schedule, a new five-day window is opened.  Here, the CO disavowed on multiple occasions the opportunity to ask for new certifications.  Thus no new window was opened to challenge ERPi's size status, and OHA was neither arbitrary nor capricious in finding so.  Although our review could end here, we also consider plaintiff's alternative argument that the SBA's decisions are irrelevant given the VA's class deviation's requirements.

Plaintiff argues that, because SBA OHA did not attempt to circumvent its own timeliness rules to take into account the VAAR deviation, the SBA decision is irrelevant and the agency was otherwise under an independent duty to assure itself of ERPi's size at the time of award, which plaintiff avers would have resulted in disqualification and award to another offeror.  We do not view the class deviation as quite so sweeping in its effect.

Although the VAAR class deviation does create a new point of inquiry for the VA into the size of status of offerors, it does not change the existing framework under which offerors certify themselves as small and veteran owned and/ or service disabled.  Offerors are required to represent to the agency that they meet the size standards at the time of offer and award.  We take this, as the parties do, to mean also at the time of award of an order against a schedule contract, but the process of making such representations we view as unchanged.

Here, the RFQ informed offerors that the VA would evaluate their eligibility through the SAM and VIP databases.  AR 164 (Questions and Answers); AR 248 (evaluation process graphic).  Answer to question 84 stated that the VA would "determine company size by referencing [SAM] representations and certifications at the time of receipt of Quotes and at the time of award."  AR 164.  Question 86 specifically asked whether the agency would include a requirement for re-certification of SDVOSB status.  The

answer was in the negative, although offerors were given the option of including updated certifications with their proposals if they did not want the agency to rely on those found in the SAM database. *Id.* The agency did as promised, and it found ERPi to have the necessary certifications in both the SAM and VIP databases. AR 1356 (best value determination).

Thus, if an offeror's on-file certification that it meets the NAICS code remains unchanged during a procurement, the agency is permitted to rely on it both at the time of offer and again at the time of award. The regulations also afford the agency discretion to require new certifications if the CO so chooses, but neither the class deviation nor any other cited regulation requires the CO to do so at the time of award. If an offeror's status in the applicable database should change for other reasons between the time of offer and award, it might be rendered ineligible at the time of award under the VA's class deviation, but nothing in that deviation independently requires an offeror to make a new certification at that time.

In sum, the agency promised to avail itself of the record certifications at the time of offer and award, and did so. We do not view the class deviation as creating a new requirement that offerors re-certify themselves for every offer that they submit to the VA and again at time of award. The FAR mandates that contractors update their size certifications only annually. 48 C.F.R. § 4.1201 (2017). Businesses are eligible to remain in the VIP database for three years unless they fall out of compliance. *See* 38 C.F.R. § 74.15(a) (2017). The best value determination contains a screenshot of intervenor's VIP profile, which listed that it was last verified on January 11, 2016, and that certification would not expire until January 11, 2019. AR 1356. Because the agency did not request re-certificaton and because it was not required to do so, the agency was not arbitrary or capricious and did not act contrary to law in finding that ERPi was eligible for award.[7]

---

[7] Intervenor also argued that, even had it been required to re-certify, it would have met the size requirements. Plaintiff alleges the opposite, and both parties cite to extra-record materials for factual support. We do not reach that issue, however, because the agency was proper in its reliance on the of-record certifications at the time.

III. The Agency's Evaluation of ERPi's Commercial Healthcare Experience Was Arbitrary

Plaintiff's other main challenge to the VA's selection of ERPi concerns how the agency viewed intervenor's relationship to two entities of similar name.  One was offered by ERPi as a major subcontractor under the Past Performance factor, and the other company was invoked as a "strategic teaming partner" that would provide experience and other non-specific support to ERPi's effort in performing the contract.  The latter company was cited by ERPi in its Commercial Healthcare Experience volume.

The experience of [                                           ] was touted by the VA in its evaluation of ERPi under the Commercial Healthcare Experience factor as providing the basis for the agency's award of a substantial confidence rating.  Plaintiff challenges that finding as unfounded by ERPi's proposal and likely the product of confusion on the part of the agency between [          ] and [                                    ].

The Commercial Healthcare Experience factor was considered by the agency to be of equal importance with the Technical factor.  The solicitation is clear that the agency was very interested in procuring consulting services from companies with experience in transforming healthcare systems, be they the prime contractor or its subcontractors.  To that end, offerors were invited to provide three examples of such past efforts under this factor from their own or their subcontractor's experience.  AR 242.  Offerors were provided five pages to write a narrative description of those efforts focusing on how that experience "equipped it with the knowledge, skills and ability to support implementation of a health care delivery system for a large, complex enterprise-wide healthcare network." AR 243.  As mentioned previously, no distinction for this factor was made between major and other smaller subcontractors.

On the first page of its proposal, in the first paragraph, intervenor listed its team to perform the work: ERPi, "[                                           .]" AR 651.  In the next paragraph, intervenor stated that, after reviewing the statement of work, "we have carefully considered additional teammates to augment our capabilities and perspectives and provide best value to the government." *Id.*  It then listed these two key teammates: "[                    ]" and "[                         .]" *Id.*  Thus ERPi began its proposal by

defining "[   ]" as referring to two separate entities, [                    ]. It touted these entities as having more experience "orchestrating health system modernization strategy and implementation than any other commercial firm." *Id.* An effort to transform [                ] was cited as the example.

In the Commercial Healthcare Experience section of its proposal specifically, ERPi listed "[

]" as "strategic teaming partners." AR 741. It again defined [   ] as a collective of the same two similarly named entities with which it began its Technical volume. The next paragraph goes on to list ten healthcare providers for which [     ] [has] provide[d] 'strategy through implementation' services and successfully execute[d] complex projects for" in a highly competitive market. *Id.* "[     ] brings the best of commercial and Federal consulting to our clients to help them achieve success." *Id.* It is unclear which entity has which experience. Intervenor then listed three specific past efforts in the field of healthcare consulting as invited by the RFQ: [                                        ]. AR 743-45. All three were listed as performed by "[     ]" or "[     ]."

Although it is unclear from these statements taken alone which of the two [     ] entities had performed these cited prior efforts, the technical evaluators understood these references to have been performed by [      ]. *See* AR 1287-89 ("Work performed by [                        ]). The parties do not dispute that this work was performed by [       ] and not [      ].

Some additional clarity is provided in the Past Performance section of intervenor's proposal. There it lists its major subcontractors–those performing at least 20 percent of the work–as [                    ] and [              ]. ERPi itself is listed as performing 50.25% of the work, [       ] 23.42%, and [                ] 23.69%. AR 755. That chart also lists the statement of work tasks that these companies would be performing. *Id.* (ERPi tasks 9.1-9.6; [      ] tasks 9.2-9.6; and [                ] task 9.5). Those three total 97.36% of the value of work under the contract. No breakdown of the percentage of work or list of tasks to be performed is found anywhere in ERPi's proposal for [        ]. Also as part of its Past Performance proposal, intervenor provided three past performance references as required by the RFQ. The first was performed by ERPi, the second by [               ] in which ERPi was a subcontractor, and the third was performed by [            ].

The VA technical evaluators considered each of the three examples provided of Commercial Healthcare Experience.  They listed each as having been performed by [        ], not [                    ], and credited the experience to ERPi.  The result was a "substantial confidence" rating, the highest possible adjectival rating, for the Commercial Healthcare Experience factor.  AR 1290.  The consensus rating report states that "[t]he Partnership with [   ] and their example experience/projects suggest a high probability of success with VA Modernization given the relevant comparisons of needed effort." *Id.*  These examples "exhibited the ability of team ERPi to support improvement and implementation of large healthcare delivery systems" and "demonstrate that Team ERPi can deliver results that VA will expect." *Id.*

The CO relied on these findings in his best value determination, agreeing with them all.  He touted the experience of ERPi's "key partner's" as driving the agency's evaluation of intervenor's Commercial Healthcare Experience.  In both trade-off analyses, ERPi's "team of subcontractors" was cited as a benefit to the government.  *See* AR 1476, 1477.

Read together, these record statements provide a clear picture that the VA relied heavily on the experience provided by "team ERPi," and most specifically that provided by [            ]. [        ], the major subcontractor, however, performed none of the work on which intervenor relied for its Commercial Healthcare Experience examples and on which the evaluators and the CO relied as giving the VA substantial confidence in ERPi's handling of this contract.  In fact, for the Past Performance evaluation, wherein intervenor could rely only on its own and its major subcontractors' experience ( i.e., not that of [              ]), the agency found moderate risk associated with ERPi's proposal. AR 1474.  The question then is whether it was reasonable for the agency to have found so much support in the undefined role to be played by [          ], which by definition could not have consisted of more than 3% of the effort.

Plaintiff answers that question in the negative, and we agree.  Plaintiff avers that [        ] and [                ] are separate entities and cites to extra-record materials to establish that they are no longer affiliated under a parent company or other corporate relationship.  Plaintiff also cites to other recent bid protests in which the relationship between the two companies was at issue.  We need neither such reference to illuminate a problem that is apparent from the record.

Defendant relies on the solicitation's allowance of any subcontractor's experience to be used for the Commercial Healthcare Experience factor, no matter the anticipated scope or size of that company's performance under the solicited contract.  Thus, in defendant's view, the agency was entitled to rely on whatever was provided by an offeror by way of a subcontractor's previous experience for this factor.  The total lack of indication in the record that [      ] would perform any particular work under the contract or otherwise offer some specified support to intervenor's and its major subcontractor's efforts is thus irrelevant in the government's view.

Intervenor takes a slightly different tack,  arguing not that the percentage of performance of the subcontractors relied on for Corporate Healthcare Experience is irrelevant, but  that the law provides for situations like these by allowing offerors to rely on the experience of "affiliates" for purposes of providing experience and other relevant solicitation requirements. Intervenor states that [            ] and [            ] are affiliates and were thus properly considered together by the agency for their collective experience.

The connection not offered by either defendant or intervenor, however, is the basis on which the agency could reasonably conclude that [      ]'s experience would be meaningfully brought to bear by "Team ERPi."[8]  Neither intervenor's proposal nor the agency's evaluation provide the missing link.  In fact, the breakdown of performance in ERPi's proposal suggests the opposite; between ERPi, [            ], and [            ], 97.36% of the work was accounted for, leaving only 2.64% for any other subcontractor to perform. And that tiny percentage also has to account for [            ], which was listed as a "strategic teaming partner" of ERPi as well as "industry experts, luminaries, and academia."  AR 755 (stating that work not captured

---

[8] At oral argument, intervenor's counsel offered that [      ] would likely be a "second-tier" subcontractor for this work, meaning that it would have a contractual relationship as a sub-subcontractor to one of ERPi's major subcontractors, but no privity with the government.  Such an arrangement would provide for [      ] to in fact perform more than some share of the 2.64 percent left over for anyone other than ERPi, [      ], and [      ].  That explanation provides no support for intervenor's position, however, because neither the agency nor the intervenor posited it as a rationale at the time of award, nor does any other document in the record suggest such a relationship.

in the chart above would be performed by experts, luminaries, and academia).

Only [                    ] was offered by intervenor as performing a large percentage of work as a subcontractor.  No representation appears in the record regarding the scope or size of [                ]'s anticipated performance.  The only thread connecting [                ] to ERPi's proposed effort are several instances where "[      ]" is defined in parentheses as including both [                ] and [                ], but in no place does it explain the corporate relationship between the two or make any other representation on which the agency could conclude that [                ] was obligated either to ERPi or to [                ] to provide support for their efforts under this contract.[9]  It is also important to note that the listing of [                ]'s three previous corporate healthcare experience efforts is nothing more than a recitation of that company's experience.  Without a legal link between the two, the agency cannot reasonably have considered the experience relevant to ERPi or any of its subcontractors.  All this is too thin a reed.

As to the argument from intervenor that [                ] is an affiliate of [                ], we again note that no such connection is drawn by intervenor's proposal or the agency's evaluation.  This court has held that an agency can rely on the experience or past performance of "a parent or affiliated company . . . where the firm's proposal demonstrates that the resources of the parent or affiliated company will affect the performance of the offeror."  *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 747 (2008).  The problem for defendant and intervenor is that, other than naming the two entities together and citing [                ]'s experience, the proposal draws no  link to assure the agency that "the resources of the . . . affiliated company will affect the performance of the offeror." *Id.*  The court has only a fixed lense through which to view the agency's actions: the words contained in the contemporaneous record of the procurement.  Here, there is no documentary support for the agency's reliance on [                ]'s corporate healthcare experience as providing the critical experience for intervenor.  The agency may have known something about the two entities' corporate relationship or it may have inferred something from ERPi's proposal, but this speculation is not supported on the record.  We therefore conclude that the agency acted arbitrarily in awarding a "substantial confidence" rating to ERPi for the Commercial Healthcare Experience factor.

---

[9] ERPi did list one individual for the Key Personnel technical subfactor as coming from [                ].  We view that fact as insufficient to draw the necessary link.

It necessarily follows that the best value determination and award to ERPi were also irrational.

## IV.  The Award Must Be Set Aside

Because defendant arbitrarily inflated the awardee's rating for one of the two most important factors, the award must be set aside and the evaluation performed again.  In order to enjoin any agency action, the court must consider four factors in reaching that conclusion.  They are: 1) whether plaintiff has succeeded on the merits, as it must to receive permanent injunctive relief; 2) whether plaintiff will suffer irreparable harm absent the injunction; 3) whether the balance of the hardships to the respective parties favors an injunction; and 4) whether it is in the public interest to grant the injunctive relief.  *PGBA, LLC v. United States*, 389 F.3d 1219, 1229 (Fed. Cir. 2004).  The court considers all of the factors together.  No one factor is dispositive other than that plaintiff must succeed on the merits in order to gain permanent injunctive relief.

As we hold above, plaintiff has demonstrated standing and shown that the agency irrationally evaluated the awardee's proposal.  The first hurdle is met.  As to the harm suffered by plaintiff absent relief, this court has often found that the loss of an opportunity to fairly compete for a contract is a significant and irreparable harm.  We find so here.  The balance of the harms favors plaintiff.  Other than delay, defendant has not shown how it will be harmed by the injunction.  Eventually the work can be performed one way or the other.  The provision of healthcare to veterans is not immediately implicated by requiring additional time be taken for this procurement.  Plaintiff, on the other hand, will be harmed by losing its opportunity to compete for the work.  The public's interest always is in ensuring the lawful expenditure of public funds, meaning that federal entities must meet the standards prescribed by procurement statues and regulations as well as the APA.  A rational and fair acquisition process is part and parcel with this interest, and defendant has not proffered any countervailing public interest.  In sum, we find that injunctive relief is warranted.  We entered an injunction at the time of the status conference on July 20, 2018.

## CONCLUSION

Although the intervenor was eligible for the award—the VA's reliance on ERPi's SAM and VIP certifications was not unlawful—the agency was arbitrary and capricious in crediting it with the commercial healthcare

experience of an entity that the agency had no apparent reason to think would meaningfully support the work or would otherwise influence intervenor's performance in a significant way.   Thus we previously granted plaintiff's motion for judgment on the administrative record, denied defendant's and intervenor's cross-motions, and entered an injunction setting aside the award to ERPi and instructing the VA to reevaluate ERPi's proposal and make a new award decision.   We have also considered plaintiff's other allegations, but as explained on the record during the status conference, none provide a basis for sustaining the protest.   Accordingly, the Clerk of Court is directed to enter judgment for plaintiff.   No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge